James OXLEY, Plaintiff-Appellee,

v.

RALSTON PURINA COMPANY,
Defendant-Appellant.

No. 15898.

United States Court of Appeals
Sixth Circuit.

July 30, 1965.

Gilbert A. Deibel, Saginaw, Mich., for appellant, Crane, Crane, Kessel & Deibel, Saginaw, Mich., on the brief.

Robert A. Steadman, Flint, Mich., for appellee.

Before O'SULLIVAN, Circuit Judge, McALLISTER, Senior Circuit Judge, and WEINMAN, District Judge.

WEINMAN, District Judge.

In this action, defendant,[*] Ralston Purina Company, seeks to set aside the judgment of the District Court, wherein plaintiff, James Oxley, was awarded damages in the sum of $142,735.20. Plaintiff's original action was filed in a Michigan State Court and was subsequently removed to the District Court. The suit was one for damages allegedly sustained because defendant breached an oral contract, the substance of which dealt with a "hog-leasing" program. Trial by jury was waived and the case was heard by the District Judge who found, by clear and convincing evidence, that an oral contract between plaintiff and defendant existed, that defendant was estopped to rely upon the statute of frauds; damages were then assessed.

In this appeal, defendant argues that an oral contract which cannot be performed in one year, although substantially performed by plaintiff and breached by defendant, is void under the Michigan statute of frauds. Defendant further contends that under the applicable statute of frauds the doctrine of equitable estoppel does not apply to an oral contract not performable within one year where no fraud or conveyance of real estate is involved. Finally, defendant contends that the amount of damages awarded by the District Judge was excessive.

The District Judge applied the correct rule as to the quantum of proof necessary in this type of case, i. e., clear and convincing evidence,[1] and since there is sufficient evidence in the record to sustain the Judge's findings, we accept his factual findings relating to the existence of an oral contract. The following is a résumé of the facts in this case and we state them substantially as the Trial Judge did in his opinion, with the addition of a few uncontested facts: Plaintiff, a successful business man who desired to own a farm and go into farming, terminated his employment and his business interests and in January of 1957 purchased a 160 acre farm near Byron, Michigan. He spent substantial sums on the house located on the farm to make it suitable for year-around living for his family. He began utilizing the farm for the production of corn and related cash crops. As he proceeded with this operation, he came into contact with Eugene King, the operator of the elevator at Byron and the local Ralston Purina dealer. During their visits together, there were discussions of plaintiff's undeveloped plans of going into a farming operation other than the simple cash crop program to which his farm was then devoted. Among various plans considered was a hog-fattening program.

Vernon Hamilton, the Ralston Purina salesman for the Byron area, learned of plaintiff's inquiry about changing his farm operation and thereafter plaintiff, King and Hamilton discussed the possibility of having plaintiff embark on a hog-leasing program which Hamilton had learned about at a seminar conducted by J. Blake Pullen for Ralston Purina.

In February of 1959, plaintiff attended a meeting with Hamilton, King and Robert McGranahan, the District Sales Manager for Ralston Purina. These men felt

---

[*] The parties will be designated as they were in the District Court.

1. Van Houten v. Vorce, 259 Mich. 545, 546, 244 N.W. 157 (1932).

that plaintiff was a good prospect for the Ralston hog-leasing program as he had the forty or fifty thousand dollars needed to launch such a program. Mr. Hamilton made certain projections of what could be done under such a program, relying in the main on quotations and figures contained in a manual printed for defendant and called "Commercial Hog Production Dealer Presentation and Group Selling Meeting Guide-February 1959." The hog-leasing manual in great detail considers a program whereby a parent farmer would develop a good strain of hogs for breeding purposes; the breeder animals would be placed out in units of twelve gilts (females) and one boar on lessee farms where the lessee would raise hogs for market. The parent or lessor farm would receive a commission on the market price of the marketed hogs as rental. The parent farm would own all of the leased breeding animals while the lessee farmer would feed and market the progeny thereof as 200-pound hogs and retain the proceeds, except for the mentioned rental or commission. The parent farm, in addition to rental income, would enjoy a build-up in value of herd on the parent farm as well as of the leased animals on lessee farms, and would also have income from cull animals not eligible for the leasing program, from breeders no longer productive, and from the sale of breeder animals after the program was well established. The program required an investment of approximately $40,000 to carry the costs of initial breeder animals, equipment, buildings and operating capital.

Plaintiff had certain reservations and questions about the proposed plan and it was agreed that the parties would visit a farm which was operating under the plan. Accordingly, arrangements were made by the Ralston people for such a visit to a farm in or near Union City, Tennessee. Plaintiff, King, Hamilton, and Mr. Hughey, plaintiff's representative, met with Mr. Pullen at the farm and went over the physical layout, installations and operations and later spent most of the balance of the day at a motel or hotel dining room, where Mr. Hamilton's projections and facts of the hog-leasing program were discussed.

Plaintiff had had little or no experience or training or education respecting farming generally, and none whatsoever respecting hog operations on a farm, whether of the commercial or leasing type. On this point, he had the reassurances of defendant's representatives that he needed none as they would supply all the know-how he would need.

As a result of the meetings, capped by the Union City meeting, it was agreed between plaintiff and defendant, through the latter's employees and agents, Hamilton and Pullen, who had actual or apparent authority to act, that plaintiff was to invest the necessary money in setting up the physical plant needed for the production of pure-bred stock; that he would do his part in the certification work; that he would supply the manpower and management services; that he would use only Ralston Purina supplies; and that he would cooperate with the Ralston people in the performance of their commitments and duties under the agreement.

The defendant, in turn, agreed that it would supply the food supplement, sanitation and other forms of supplies; that it would provide the necessary technical guidance and assistance; that it would obtain the leasing farms; and that during the period before the full operation of leasing could be established, it would take all of plaintiff's surplus stock.

The parties also agreed to adopt the projections of Mr. Hamilton for a five-year program at $2.00 per leased hog.

Soon after plaintiff's return from Union City, he embarked on his building program and there was cooperation and performance by him and defendant's representatives. Thereafter, plaintiff continued to perform in accordance with the terms of the oral agreement and defendant made use of plaintiff's operations in the hog-leasing program in promoting the public acceptance of its products by pictures and information disseminated through its house publications and by

arranging a public gathering at plaintiff's farm. There was no problem until the time came for defendant to take, and dispose of, plaintiff's surplus stock. At this point, defendant failed and refused to perform; leaving plaintiff to rescue what he could from the operation. Defendant had neither arranged for and secured leasing farms, nor would it take the surplus stock.

After stating his factual findings, the Trial Judge rejected defendant's argument that plaintiff's action was barred by the Michigan statute of frauds and held that defendant was prevented, under the doctrine of equitable estoppel or estoppel in pais, from interposing the statute as a defense.

The applicable Michigan statute of frauds provides:

"In the following cases specified in this section, every agreement, contract and promise shall be void, unless such agreement, contract or promise, or some note or memorandum thereof be in writing and signed by the party to be charged therewith, or by some person by him thereunto lawfully authorized, that is to say:

"1. Every agreement that, by its terms, is not to be performed in 1 year from the making thereof * * *" [2]

As previously stated, defendant argues that the oral contract is void under the above quoted statute and also contends that the doctrine of equitable estoppel has no application to the facts in this case because it is only where an oral contract not performable within a year is related to a conveyance of real estate or where there is fraud that performance or change of position by one party is recognized as being an exception to the operation of the statute. Plaintiff argues that the determination of whether the doctrine of equitable estoppel will be applied by the Michigan Courts has always been based upon the actions of

the parties in the individual case, not upon the particular type of case involved.

At the outset we note that neither counsel for plaintiff, counsel for defendant nor the Court has been able to find a Michigan case which has dealt with the specific problem. We have found no Michigan case which has said that in oral contracts not performable within one year under the applicable statute the doctrine of equitable estoppel can be applied to deny use of the statute as an affirmative defense, nor have we found any Michigan case which has said that the doctrine of equitable estoppel cannot be so applied.

Defendant cites, as the leading case on the question of law involved, Whipple v. Parker,[3] and as the most recent, definitive analysis of the question, Ordon v. Johnson.[4] In Whipple v. Parker, supra, plaintiff and defendant orally agreed that plaintiff would arrange for defendant to be admitted as a partner in the Whipple Manufacturing Company and to have one-half of plaintiff's interest, which would be a one-fourth interest in the Company, and defendant was to come into the business and pay plaintiff for that interest at the end of three years. Plaintiff performed by transferring the interest to defendant; however, defendant did not perform. The Michigan Court held the oral contract void under the statute of frauds because it was a contract not performable within one year from the making thereof. The Court also held that plaintiff, though he could not enforce the contract, could maintain an action to recover the value of the transferred stock upon the theory of quantum meruit, i. e., for the benefit conferred by plaintiff and received and appropriated by defendant.

In Ordon v. Johnson, supra, plaintiff sued in equity for specific performance of an alleged oral contract. Plaintiff and defendant were partners in a civil engineering business and negotiations were had for the purchase of plaintiff's inter-

---

2. Mich.C.L.1948, § 566.132; Mich.Stat. Anno., § 26.922(1).

3. 29 Mich. 369 (1874).

4. 346 Mich. 38, 77 N.W.2d 377 (1956).

est by defendant. Two different agreements were reduced to writing but neither was signed by the parties; thereafter, plaintiff withdrew from active participation in the partnership, a dissolution certificate was filed in the County Clerk's Office and defendant filed an assumed name certificate and carried on the business and used its assets. Defendant refused to perform and plaintiff sued in equity for specific performance. Defendant interposed the statute of frauds as a defense since neither of the two payment plans as orally agreed upon was performable within one year. The Court, citing Whipple v. Parker, supra, held the alleged oral contracts void under the Michigan statute of frauds notwithstanding the fact that the acts of the parties done in recognition of their agreement constituted substantial performance. The case was transferred to the law side and plaintiff was given an opportunity to seek relief on a quantum meruit theory of benefit conferred upon defendant because of assets transferred to him and utilized by him to his benefit.

In each of the foregoing cases, and in numerous others which this Court has examined where the transfer of real property was not involved, the Michigan Supreme Court has repeatedly stated that an oral contract which cannot be performed in one year from the making thereof is void and partial or substantial performance does not take the contract out of the statute of frauds.[5] However, none of the Michigan cases which we have read has stated the applicability of the doctrine of equitable estoppel to the problem.

■■ We must note at this point that though the doctrine of part performance has its basis in an estoppel, part performance and equitable estoppel are not the same.[6] The doctrine of part performance has historically been applied only to contracts involving the sale of land,[7] whereas the doctrine of equitable estoppel is more encompassing. Under that doctrine, the principle is that

"* * * he who by his language or conduct leads another to do, upon the faith of an oral agreement, what he would not otherwise have done, and changes his position to his prejudice, will not be allowed to subject such person to loss or injury, or to avail himself of that change to the prejudice of such other party."[8] (Footnote omitted.)

■ The Trial Judge, citing Brummel v. Brummel,[9] a case involving an oral contract to convey real property, held that Michigan, like other jurisdictions, applies the doctrine of equitable estoppel in those cases where its application is called for by the facts. The language quoted by the Judge from that case is:

"'* * * If one party to an oral contract, in reliance upon the contract, has performed his obligation thereunder so that it would be a fraud upon him to allow the other party to repudiate the contract, by interposing the statute, equity will regard the contract as removed from the operation of the statute. * * *'"

At this point, we note that the New York statute of frauds regarding oral contracts which are not performable within one year is substantially the same

5. See, for example, Cassidy v. Kraft-Phenix Cheese Corp., 285 Mich. 426, 280 N.W. 814 (1938). In that case, there was an executory oral contract whereby plaintiff would acquire the exclusive manufacturing and selling rights of defendant's product for a certain territory. The contract provided for plaintiff to purchase from defendant merchandise in excess of the amount which rendered oral contracts unenforceable under the statute of frauds. The Court held the oral contract void and quoted at length from

New York cases, to the effect that a contract void under the statute is void for all purposes.

6. Lyle v. Munson, 213 Mich. 250, 260, 181 N.W. 1002 (1921) and 3 Williston On Contracts (3rd ed. 1960), § 533A at pp. 791–796.

7. 3 id. § 533 at p. 770.

8. 3 id. § 533A at p. 800.

9. 363 Mich. 447, 109 N.W.2d 782 (1961).

as that of Michigan [10] and the Courts of each state have referred to opinions of the other.[11] We have researched the law of New York on the subject and note with interest that the Court of Appeals for the Ninth Circuit had difficulty in ascertaining the status of the New York law in Alaska Airlines, Inc. v. Stephenson.[12] In that case, an employee, Stephenson, was discharged by his employer, Alaska Airlines, Inc., and sued for breach of an oral contract of employment. That agreement, which was one which could not be performed fully within one year, was that Stephenson would go to work for the Airline at a certain monthly salary and that they would get together in six weeks to three months and work out a long-range agreement in writing. Stephenson moved his family from California to Alaska, went to work and relinquished his rights to return to work with a former employer. The Court of Appeals decided that the law of Alaska was applicable, but in dictum stated that in the case before them New York would probably deny Stephenson recovery, but of that conclusion they were not positive because the New York Courts had many times let down the bar on the statute of frauds.[13] The Court of Appeals noted that New York had not clearly declared its statute of frauds one of substance only, going to the essential validity of the contract.[14]

Though New York Courts, as Michigan Courts, have stated that oral contracts void under the statute of frauds are void for all purposes, these same Courts have, in various cases not involving real property, applied the doctrine of equitable estoppel.

In Ant v. The Drug Products Co., Inc.[15] the Court applied the doctrine when it stated:

"Plaintiff asserts that the above allegations [regarding an oral contract] have no relevancy to the action since the contracts between plaintiff and defendant were in writing and could not be altered in any manner except by another writing. That is the general rule. However, our courts will not permit the Statute of Frauds to be used to protect one who by his agreement, acts and conduct has induced another to incur expense and alter his position to his damage. * * * "

In support of the foregoing equitable proposition, the Court cited, among other cases, Imperatore Realty Company, Inc. v. Tull,[16] a case involving real estate and applying the doctrine of equitable estoppel.

In M. H. Metal Products Corporation v. April,[17] defendant guaranteed in writing payment of twenty thousand sets of jacks at 80 cents each "if manufactured and delivered * * * in accordance with the terms and conditions of the said contract." The sockets were somewhat weak and needed strengthening and plaintiff agreed to make the change at defendant's request. It was agreed that the change would cost 20 cents for each jack, making the agreed cost for each jack one dollar instead of eighty cents as provided in the original contract. The defendant, acting for the purchaser, and in the presence of the representative of plaintiff, ordered a new die, to be used in making the jacks as altered, at an

---

10. N.Y.Consol.Laws, General Obligations Law, Vol. 23A McKinney's Consol.Laws, c. 24-A, § 5-701(1) c. 561, eff. Sept. 27, 1964.

11. See, for example, Cassidy v. Kraft-Phenix Cheese Corp., supra at footnote 5.

12. 217 F.2d 295, 15 Alaska 272 (9 Cir. 1954).

13. See cases cited Id., 217 F.2d at p. 297.

14. See Dias v. Tire Mart, Inc., 27 Misc.2d 24, 208 N.Y.S.2d 624, 634 (1960) where

the Court stated, regarding the statute of frauds: " * * * Under our law, it is clear that it is not the cause which is barred, but its maintenance, and that is a matter of defense * * * defendant has the burden of proving this affirmative defense. * * * "

15. 7 Misc.2d 471, 163 N.Y.S.2d 1008, 1010 (1957).

16. 228 N.Y. 447, 127 N.E. 263 (1920).

17. 251 N.Y. 146, 167 N.E. 201 (1929).

agreed price to be paid to the man who was to make the die for the purchaser. However, defendant refused to guarantee the additional 20 cents, but orally agreed to remain bound by his original guaranty. Subsequently, plaintiff sued defendant on the original guaranty. Defendant raised the defense of the statute of frauds on the grounds that the original contract had been altered and his guaranty no longer applied. The Court held that defendant was estopped to raise that defense. It noted that a contract of guaranty is required to be in writing under the statute of frauds [18] and that contracts which are within the statute cannot be changed or altered except in the manner which the statute requires in the first instance to make them enforceable. The Court then continued and stated:

"\* \* \* The guarantor may, however, by his agreement and conduct place himself in a position where he cannot avail himself of the defense. The statute does not protect one who by his agreement, acts and conduct, has induced another to incur expense and alter his position to his damage. One cannot take advantage of his own wrong.

"The defendant induced the plaintiff to change the construction of the jack, consented to the increase in price, and agreed to remain bound by his guaranty to the extent of eighty cents for each jack. He never notified the plaintiff of any change in his attitude, but induced the plaintiff to go on with the contract to manufacture the jacks relying on his guaranty. He cannot now alter his position and avail himself of the Statute of Frauds. The law will not permit him to take advantage of the statute when his unrevoked affirmative act causes the plaintiff to consent to the change in the contract.

Parole evidence may be received to establish the fact that the change in the contract was induced by the affirmative act of the defendant. \* \* \* " [Citing Imperatore Realty Company, Inc. v. Tull, supra].

We find, after reviewing the foregoing New York cases, that the doctrine of equitable estoppel has been applied by some New York Courts in oral contract cases not involving real estate to prevent a defendant from relying upon the defense of the statute of frauds. And we do not believe that the application of the doctrine of equitable estoppel in such cases is incongruous with the holding that contracts void under the statute of frauds are "void for all purposes." The reason for this is that when the doctrine of equitable estoppel is invoked, defendant is precluded from asserting the statute and therefore the oral contract does not become "void for all purposes." Stated another way, the oral contracts which we are considering become void because of the application of the statute of frauds and if defendant is denied the right to assert the statute, the oral contracts exist as if there were no such statute.

As to the Michigan statute of frauds, this Court has several times had before it cases involving the statute under consideration in the instant case, but the applicability of the doctrine of equitable estoppel was never discussed. In McLaughlin v. Ford Motor Company,[19] plaintiff sued to recover damages for an alleged breach of an oral contract to give him a position in defendant Corporation. The trial, on the question of liability only, was before a jury and at the end of plaintiff's case the District Judge sustained defendant's motion for a directed verdict. In affirming the action of the District Judge, this Court stated:

"We agree with the ruling of the District Judge that the oral contract herein sued upon falls within Sec.

---

18. This is the same statute of frauds which requires contracts which cannot be performed within one year to be in writing. Subd. 1. See the current provision regarding contracts of guaranty. N.Y.Consol. Law, General Obligations Law, Vol. 23A, § 5–701(2), c. 561, eff. Sept. 27, 1964.

19. 269 F.2d 120, 124 (6 Cir. 1959).

2 (1) of the Michigan Statute of Frauds, which declares void 'Every agreement that, by its terms, is not to be performed in 1 year from the making thereof * * *', unless some note or memorandum thereof be in writing and be signed by the party to be charged therewith, or by some person by him thereunto lawfully authorized. * * * It is clear that the oral agreement in the present case provided for employment to begin more than a year after the making of the agreement and comes squarely within the terms of the statute. * * * "

And in Jackson Iron Company v. Negaunee Concentrating Company [20] this Circuit considered the applicable Michigan statute of frauds and stated:

" * * * We are of opinion that if any contract can be said to have arisen from the conversation above stated, it was within the statute of frauds of Michigan, which renders unenforceable every agreement not in writing that by its terms is not to be performed within one year from the making thereof * * * Giving the evidence the construction most favorable for the plaintiff, the contract was an agreement by the defendant to pay during the life of the contract at least $2,500.00 a year for the privilege of taking the iron ore and using it, in consideration of the plaintiff's agreement to forbear to forfeit the rights of the Union Company under the contract, and thereby to prevent the defendant company from continuing its operation under its contract with the Union Company. This was certainly an agreement on the part of the defendant to do something which, by its terms, could not be performed within a year, for both contracts had at least 10 years to run. Even if it can be said that the plaintiff could and did fully perform within a year on its part that which formed the consideration of the defendant's promise, namely, the forbearance to terminate the contract for a reasonable time, this was not, in Michigan, such a part performance as would take the case out of the statute of frauds. * * * " [Citing, among other authorities, Whipple v. Parker, supra].

In neither of the foregoing cases was the doctrine of equitable estoppel discussed.

■■ Since we have found no controlling Michigan law on the problem before us,[21] we believe that the District Judge was free to exercise his independent judgment in the matter and to adopt the rule which he thought was sound and supported by the better reasoning.[22] As previously stated, he applied the general rule that the doctrine of equitable estoppel applies in those cases where its application is called for by the facts. That rule, applied to the statute of frauds, is stated by Williston as:

"Where one has acted to his detriment solely in reliance on an oral

---

20. 65 F. 298, 304 (6 Cir. 1895).

21. Although we have found no controlling Michigan law, we believe that we are justified in concluding that the Michigan Supreme Court would find, as the New York Courts have found, that under the applicable statute of frauds the cause of action is not barred. See Dias v. Tire Mart, Inc., supra, footnote 14, and cases cited therein. See also Reeck v. Caloy Corporation, 329 Mich. 453, 45 N.W.2d 349 (1951) wherein the Michigan Supreme Court held that an oral agreement is not affected by the statute of frauds if it is supported by a consideration separate and apart from its performance, such as where the plaintiff has given up something to defendant for which plaintiff would not be compensated unless the agreement was enforced. If the Michigan Court had considered the statute of frauds as barring the cause of action, it could not logically have reached the above noted result.

22. American Fidelity & Casualty Company, Inc. v. Indemnity Insurance Company of North America, 308 F.2d 697, 699 (6 Cir. 1962).

agreement, an estoppel may be raised to defeat the defense of the Statute of Frauds. This is based upon the principle established in equity, and applying in every transaction where the Statute is invoked, that the Statute of Frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting, or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme. It is called into operation to defeat what would be an unconscionable use of the Statute, and guards against the utilization of the Statute as a means for defrauding innocent persons who have been induced or permitted to change their position in reliance upon oral agreements within its operation." [23] (Footnotes omitted.)

Williston also quotes the following with approval:

" 'We can see no good reason for limiting the operation of this equitable doctrine to any particular class of contracts included within the statute of frauds, provided always the essential elements of an estoppel are present, or for saying otherwise than * * * that it applies "in every transaction where the statute is invoked." * * *' " [24]

■ We agree with the rule as above stated and believe that the Michigan Supreme Court would have applied the foregoing language had the problem in this case been before it.

The defendant has also urged that there was no fraud alleged or proved by plaintiff and therefore there can be no estoppel in this type of case. However,

fraud in the usual sense if not required, as stated by Williston:

"The fraud most commonly treated as taking an agreement out of the Statute of Frauds is that which consists in setting up the Statute against its enforcement after the other party has been induced to make expenditures or a change of situation in regard to the subject matter of the agreement, or upon the supposition that it was to be carried into execution, and the assumption of rights thereby to be acquired, so that the refusal to complete the execution of the agreement is not merely a denial of rights which it was intended to confer, but the infliction of an unjust and unconscionable injury and loss." [25] (Footnote omitted.)

He further states:

"Actual intent or design to mislead is not, however, essential. There need not be a corrupt motive or evil design; it is sufficient if the circumstances are such as to render it unconscionable to deny facts which the party by his silence or representation has caused the other party to believe in and act upon, and the denial of which must operate as a fraud upon him." [26] (Footnote omitted.)

We pass now to the question of damages, which defendant alleges are excessive. The Trial Judge found that "expenses charged to the operation" were established in the amount claimed by plaintiff, being $56,567.20. The Court further stated that it

"does not find a specific guarantee nor can the projections which were used (and achieved by the plaintiff, so far as his operations are con-

---

23. 3 id. § 533A at pp. 796–797.

24. 3 id. at p. 803. See also Statute of Frauds, 49 Am.Jur. § 581 at p. 889 wherein it is stated that " * * * the statute of frauds was designed as the weapon of the written law to prevent fraud, while the doctrine of estoppel is that of the unwritten law to prevent like evil. Each is effective in its appropriate field. Both are essential to prevent and redress wrongs. * * *" (Footnote omitted.)

25. 3 id. at p. 798.

26. 3 id. at p. 801.

cerned) respecting the projected cash income from the 'leasing farms' furnish a base for the award of damages, as they would be conjectural and speculative."

The Court listed as the damages warranted:

"$56,567.20 net loss from the program;

$75,900.00 value of herd after 3 and ½ years;

$10,368.00 value of growing pigs; making a total of $142,735.20."

The amounts $75,900.00 and $10,368.00 were, we assume, derived from the adoption of the figures testified to by plaintiff's witness, Mr. Hamilton, that after three and one-half years there would have been 1012 mature hogs in the program, valued at $75.00 each (equalling $75,900.00) and 576 growing pigs on plaintiff's farm, valued at $18.00 each (equalling $10,368.00). We note that the $75.00 and $18.00, respectively, are market values without subtracting the cost of raising the pigs. No law has been cited to us to sustain the awarding of gross profits as damages and we find it to be error in making such an award. We also note that the Trial Judge did not state the basis of his award of "expenses charged to the operations." (The Trial Judge did not find that defendant guaranteed that if the program failed defendant would reimburse plaintiff for his expenses. Were these damages which arose because of defendant's refusal to take and dispose of plaintiff's surplus stock?) Nor did he state how he arrived at the figure of three and one-half years as the length of time of the program for the purpose of determining the loss.

■■ We are not holding that the awarding of the expenses or that the use of three and one-half years as the multi-ple were improper as a matter of law, we are holding that there are not sufficient facts stated in the opinion to sustain the foregoing as being proper. The Trial Judge shall, upon remand, make such additional findings as are necessary to form the basis of any damages which he may award. Of course, as to loss of profits as damages, they may be awarded only if they can be determined with a reasonable degree of certainty.

We shall, so as to avoid a future appeal on the same questions, consider several other matters regarding damages and raised by defendant in its brief. Defendant argues that the award of $56,567.20 should be reduced as follows: 1) $8,600.-00 for the value allegedly recaptured by plaintiff upon the resale of his farm; 2) $1,650.00 which defendant claims was agreed to between the parties as the sales price realized by plaintiff on the sale of some of his hog-program equipment; and 3) $7,527.95 because of a tax saving to plaintiff because he had outside income against which he could apply his loss from the farm operations.

As to the $8,600.00, the Trial Court was free to accept or reject the computations of defendant as to the value of the farm and the amount recaptured upon resale; as to the $1,650.00, the Court should reduce any damages awarded by that sum if that agreement was actually entered into by the parties; as to the $7,527.95, defendant cites no cases in support of the proposition which he urges and we reject the same.

This case is remanded to the District Court for further consideration on the question of damages; the award of damages is vacated, the Court shall make such additional findings as are necessary to form the basis of any damages which he may award.